**REVISED SEPTEMBER 29, 2017**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-30561

United States Court of Appeals
Fif h Circuit

**FILED**
September 27, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellant

v.

DON MOSS; CURTIS DANTIN; GRAND ISLE SHIPYARDS, INCORPORATED; CHRISTOPHER SRUBAR,

Defendants - Appellees

Appeals from the United States District Court
for the Eastern District of Louisiana

Before JONES, CLEMENT, and ELROD, Circuit Judges.

EDITH H. JONES, Circuit Judge:

A fatal welding accident occurred on an offshore oil platform in the Gulf of Mexico in November 2012. Three years after that incident, the government indicted the owner and operator of the platform and several oil platform contractors, charging criminal violations of the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331, *et seq.*, and the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, as well as involuntary manslaughter. 18 U.S.C. § 1112. The defendants moved to dismiss. The district court left all of the charges in place except for the OCSLA charges against the contractor defendants, appellees

No. 16-30561

Grand Isle Shipyards, Inc. (GIS), Don Moss, Christopher Srubar, and Curtis Dantin, which it dismissed for failure to state an offense. Fed. R. Crim. Pro. 12. The government timely appealed.  Because the OCSLA regulations do not apply to these appellees, the judgment of the district court is **AFFIRMED**.

## BACKGROUND

*1. OCSLA and Regulatory Enforcement*

Congress enacted OCSLA in 1953, granting the Department of the Interior authority to promulgate and enforce safety and environmental regulations on "any holder of a lease or permit under [OCSLA]."  43 U.S.C. § 1348(b).  For over 60 years, the federal government did not regulate or prosecute oilfield contractors, as opposed to lessees, permittees, or well operators, under OCSLA.[1]

A month after the 2010 Deepwater Horizon spill, however, the Secretary of the Department of the Interior reorganized the Minerals Management System (MMS), tasked with enforcing OCSLA, into three agencies: the Office of Natural Resources Revenues (ONRR), the Bureau of Ocean Energy Management (BOEM), and the Bureau of Safety and Environmental Enforcement (BSEE).  *See* Secretarial Order 3299 (May 19, 2010).  The newly-created BSEE started aggressively enforcing OSCLA and its regulations against a series of contractors.  BSEE announced in a 2011 press release about enforcement actions, "[t]his is the first time the Department of the Interior has issued INCs [incidents of non-compliance] directly to a contractor that was not

---

[1] The government conceded there are no reported cases of a successful prosecution of a contractor under OCSLA, and the only evidence of such a prosecution cited by the government is a New York Times article about a contractor's entering a guilty plea in 1988.

the well's operator."[2]  In 2012, just months before the incident that gave rise to this case, BSEE issued an internal "Interim Policy Document" opining that contractors may be liable for civil penalties under OCSLA, although this document made no mention of criminal liability.  *See* Bureau of Safety and Environmental Enforcement, IPD No. 12-07, Issuance of an Incident of Non Compliance (INC) to Contractors (Aug. 15, 2012).

*2. The West Delta 32 Lease Block Incident and Indictment*

In summer 2010, Black Elk Energy Offshore Operations, LLC obtained a federal oil and gas lease covering a portion of the Gulf of Mexico known as the West Delta 32 Lease Block, and operated a three-platform production facility there.  Black Elk contracted with Appellee GIS and Wood Group PSN, Inc. to provide platform workers.  Wood Group also furnished a "Person-in-Charge" for the platform, Appellee Srubar.  Srubar and Wood Group were responsible for conducting safety inspections and issuing safety permits for "hot work," such as welding and grinding, that emits sparks.

In September 2012, Black Elk interrupted its oil and gas production on West Delta 32 to commission construction projects on the platforms that could not be performed during production.  Compass Engineering and Consulting, LLC[3] drew up the construction plans, and Compass hired Appellee Moss as an

---

[2] *See* BSEE, "BSEE Issues Violations Following Investigation Into Deepwater Horizon," https://www.bsee.gov/newsroom/latest-news/statements-and-releases/press-releases/bsee-issues-violations-following, accessed June 22, 2017.

[3] Neither Wood Group nor Compass is a party to this appeal.

3

independent contractor and onsite inspector to coordinate and manage the work on the West Delta 32 platform projects.

One project involved installing a divert valve on the Lease Automatic Custody Transfer (LACT) unit.[4]  During this work, someone discovered that the prefabricated piping necessary to upgrade the LACT unit was missing.  A Black Elk manager decided the piping should be rebuilt.  To do that, the crew was required to perform "hot work" and weld the sump line piping, some of which lay within 20 feet of the Wet Oil Tank.  On November 16, Wood Group issued a hot work permit to the GIS crew.

A fatal explosion occurred that morning, killing three men, injuring others, and discharging pollutants into the Gulf of Mexico.  The cause of the explosion is disputed, but the government contends the contractors were criminally liable because they failed to obtain proper authorization to weld, failed to conduct appropriate pre-work inspections, and failed to ensure the construction area was safe for hot work as required by OCSLA safety regulations.

Criminal indictments were issued three years later against Black Elk, as the lessee-operator, and the contractor appellees. The second superseding indictment charged the contractor-appellees with eight counts of violations of 43 U.S.C. § 1350(c) for knowing and willful violations of OCSLA's enabling regulations. The indictment charged Black Elk, GIS, Wood Group, Srubar, and Dantin with five separate counts for failing to perform pre-work inspections on each of the five days before the incident, in violation of 30 C.F.R. §§ 250.113(c)(1)(ii) and 250.146(c).  It charged all of the defendants with a

---

[4] A LACT unit measures the net volume, as well as the quality, of liquid hydrocarbons, and provides for the automatic measurement, sampling, and transfer of oil from the lease location into a pipeline.

single count for failing to perform a pre-work inspection on the actual day of the incident. It also charged Black Elk, GIS, Moss, and Dantin with failing to render the hydrocarbons in the sump-line piping and oil tanks inert before welding on the day of the explosion under 30 C.F.R. §§ 250.113(c)(3) and 250.146(c). Finally, the indictment charged those four parties with failing to obtain written authorization from the Person-in-Charge before welding the sump-line piping on the day of the explosion under 30 C.F.R. §§ 250.113(c)(1)(i) and 250.146(c).

Notably, the indictment also charged Black Elk and GIS with three counts of involuntary manslaughter, 18 U.S.C. § 1112, and all of the defendants were charged with one count of violating the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, by negligently discharging oil into the Gulf of Mexico. The district court did not dismiss those counts and they remain pending.

*3. District Court Proceedings*

The defendants filed several motions to dismiss the charges against them. The district court issued a written order dismissing the OCSLA charges against Wood Group, GIS, Moss, and Dantin, and a second written order dismissing the OCSLA charges against Srubar days later. The district court analyzed each of the regulatory provisions cited in the indictment and concluded that none of the OCSLA regulations apply to oilfield contractors. Central to this analysis, the court pointed out that each of the three specific

No. 16-30561

provisions of OCSLA regulations underlying the charged criminal violations[5]
imposes requirements addressed to "You."

Under the OCSLA regulations, "You" is a defined term:

> *You* means a lessee, the owner or holder of operating rights, a
> designated operator or agent of the lessee(s), a pipeline right-of-
> way holder, or a State lessee granted a right-of-use and easement.

30 C.F.R. § 250.105. [6]  The district court held this definition does not include
contractors, subcontractors or service providers.  Finding that only Black Elk
is the owner, lessee, or holder of operating rights, and that no other regulatory
provision brought contractors within the ambit of "You," the district court
dismissed the OCSLA counts against the appellees.  The government timely
appealed.

---

[5]In relevant part, those provisions read:

30 C.F.R. § 250.113(c)(1)(i): "(c) If you cannot weld in one of the designated
safe-welding areas that you listed in your safe welding plan, you must meet
the following requirements: (1) You may not begin welding until: (i) The
welding supervisor or designated person in charge advises in writing that it is
safe to weld."

30 C.F.R. § 250.113(c)(1)(ii): "If you cannot weld in one of the designated safe-
welding areas that you listed in your safe welding plan, you must meet the
following requirements: (1) You may not begin welding until: . . . (ii) You and
the designated person in charge inspect the work area and areas below it for
potential fire and explosion hazards."

30 C.F.R. § 250.113(c)(3): "(c) If you cannot weld in one of the designated safe-
welding areas that you listed in your safe welding plan, you must meet the
following requirements: . . . (3) You may not weld piping, containers, tanks, or
other vessels that have contained a flammable substance unless you have
rendered the contents inert and the designated person in charge has
determined it is safe to weld. This does not apply to approved hot taps."

[6] The Department of the Interior rewrote the OCSLA regulations in the second-person
in 1999 as part of a "plain English" rendering by BSEE's predecessor MMS that described
regulated parties as "You."  *See* 63 Fed. Reg. 7335, 7336 (Feb. 13, 1998).

No. 16-30561

## STANDARD OF REVIEW

The district court's interpretation of a federal statute is reviewed de novo, *United States v. Kaluza*, 780 F.3d 647, 653 (5th Cir. 2015), as is the district court's interpretation of a regulation. *Anthony v. United States*, 520 F.3d 374, 377 (5th Cir. 2008). "In reviewing a challenge to an indictment alleging that it fails to state an offense, the court is required to take the allegations of the indictment as true and to determine whether an offense has been stated." *United States v. Crow*, 164 F.3d 229, 234 (5th Cir. 1999).

"This court interprets regulations in the same manner as statutes, looking first to the regulation's plain language." *United States v. Fafalios*, 817 F.3d 155, 159 (5th Cir. 2016). "[W]here, as here, a regulatory violation carries criminal penalties, the regulation 'must be strictly construed and cannot be enlarged by analogy or expanded beyond the plain meaning of the words used.'" *United States v. CITGO Petroleum Corp.*, 801 F.3d 477, 482 (5th Cir. 2015) (quoting *United States v. Clark*, 412 F.2d 885, 890 (5th Cir. 1969)). *See also Diamond Roofing Co. v. OSHRC,* 528 F.2d 645, 649 (5th Cir. 1976) ("If a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express.").

## DISCUSSION

On appeal, the government relies on four main arguments. First, the government contends that a plain reading of OCSLA subjects any person, including contractors and their employees, to criminal penalties for violating the regulations promulgated under the statute. 43 U.S.C. § 1350(c). Second, OCSLA regulations govern the appellees' conduct because they were the "person[s] actually performing the activit[ies]," and are thus "jointly and severally responsible" under 30 C.F.R. § 250.146(c). Third, courts have upheld both civil and criminal penalties imposed under similar statutory and

regulatory schemes.  Fourth, OCSLA's regulations support civil and criminal penalties for any person "responsible for a violation" of the regulations. 30 C.F.R. § 250.1402.  We discuss each argument in turn.

## I.

"Any person who knowingly and willfully" violates "any regulation or order issued under the authority of this subchapter designed to protect health, safety, or the environment . . ." may be subject to criminal penalties under OCSLA.  43 U.S.C. § 1350(c).  Because OCSLA defines a "person" to include "a natural person, an association, a State, a political subdivision of a State, or a private, public, or municipal corporation," 43 U.S.C. § 1331(d), the government contends any contractor, subcontractor, or individual is a "person" under this penalty provision.  Further, the government argues, this plain reading is reinforced by 43 U.S.C. § 1350(d), which extends criminal liability for regulatory violations to corporations and "any officer or agent of such corporation . . . who . . . authorized, ordered, or carried out the proscribed activity."

The appellees respond that OCSLA, read as a whole, precludes the government from criminally prosecuting those who are not holders of OCS leases or permits.  They argue that 43 U.S.C. § 1348 identifies who has authority to enforce safety and environmental regulations promulgated under OCSLA: "The Secretary, the Secretary of the Department in which the Coast Guard is operating, and the Secretary of the Army . . . ."  43 U.S.C. § 1348(a). The following section, 1348(b), then identifies who must comply with those regulations: "It shall be the duty of *any holder of a lease or permit* under this subchapter . . ." to comply with regulations governing workplace safety and health for their own employees and those of any "*contractor or subcontractor*." 43 U.S.C. § 1348(b) (emphases added).  Because section 1348(b) specifically imposes a duty on lessees and permittees, and equally specifically references

but does not impose its regulatory duties on contractors and subcontractors, the latter parties are textually excluded from those duties. It necessarily follows that 43 U.S.C. § 1350(c) cannot impose criminal penalties on contractors because they are not the "persons" given a duty to comply.[7] Section 1350(c) instead places criminal exposure squarely on the lessees and permittees not only for their own misfeasance but for that of the contractors and subcontractors they hire. The appellees additionally contend that any regulations that would hold them criminally liable exceed Congress's explicit grant of statutory authority.[8]

There is much to be said for appellees' argument given the government's failure ever before to seek criminal penalties against a contractor or individual employees in the sixty-plus year history of the OCSLA. The government's past inaction speaks volumes about the scope of its regulatory authority, particularly when measured against its breathless defense of the policy importance of these indictments. To resolve this appeal, however, we need not decide whether OCSLA's criminal liability provision could extend to contractors, subcontractors and their employees. If OCSLA regulations in force at the time of the incident do not apply to the appellees, they cannot be held criminally liable even if the statute authorizes regulations that could foist

---

[7] That section 1348(b) excludes contractors and subcontractors from direct regulatory control under OCSLA is reinforced in the provision's drafting history. When enacting the provision that became section 1348 in 1977, Congress rejected language that would have extended the safety and environmental duties it imposed on lessees and permit holders to render them liable "jointly with any employer or subcontractor . . . ." OCSLA Amendments of 1977, H.R. 1614, 95th Cong. § 22(b) (1977); OCSLA Amendments of 1977, S.9. 95th Cong. § 22(b) (1977).

[8] *Accord Island Operating Co. v. Jewell*, No. 6:16-CV-00145, 2016 WL 7436665 (W.D. La. Dec. 23, 2016) ("[A] party who is neither a lease-holder nor a permit-holder . . . is not identified in Section 1348 as having a duty related to environmental and safety standards, and, thus . . . cannot be subject to a penalty or fine. Consequently, the statute's plain language, when read in context, is clear, and does not embrace contractors."), *appeal filed*, No. 17-30440 (5th Cir. May 27, 2017).

criminal liability upon them.  Consequently, we assume *arguendo*, without deciding, that section 1350(c) may expose contractors and subcontractors to criminal liability, and move on to the issue of whether the regulations can support this criminal indictment.

## II.

In its quest to penalize the contractors, the government first runs up against the regulatory definition of "You," which does not include contractors. *See* 30 C.F.R. § 250.105.  The government barely mentions this provision in its briefing.  Instead, the government points to § 250.146(c):

> Whenever the regulations in 30 CFR parts 250 through 282 and 30 CFR parts 550 through 582 require the lessee to meet a requirement or perform an action, the lessee, operator (if one has been designated), and the person actually performing the activity to which the requirement applies are jointly and severally responsible for complying with the regulation.

30 C.F.R. § 250.146(c).  The government's essential argument is that because the appellees were the "person[s] actually performing the activity to which the [welding] requirement[s] appl[y]," they are "jointly and severally responsible for complying with the regulation." *Id.*  Thus, their knowing and willful failure to comply with provisions of 30 C.F.R. § 250.113 would be a criminal violation under OCSLA's criminal enforcement provision.  43 U.S.C. § 1350(c).

It is a hornbook principle of interpretation that when "two provisions operate *in pari materia*," they "should not be read in isolation," but must be construed together. *United States v. Onick*, 889 F.2d 1425, 1433 (5th Cir. 1989). *See also RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* 132 S. Ct. 2065, 2071 (2012) (referencing "the cardinal rule that, if possible, effect shall be given to every clause and part of a statute") (internal quotation omitted).  As part of the same regulatory framework, sections 250.105 and 250.146(c) must be read together.  Section 250.105 unambiguously defines "You" to mean "a lessee, the

owner or holder of operating rights, a designated operator or agent of the lessee(s), a pipeline right-of-way holder, or a State lessee granted a right-of-use and easement." 30 C.F.R. § 250.105. This definition excludes contractors and the appellees charged here. Moreover, all of the welding regulations that form the basis of the criminal indictment reference only "you"—the group of responsible parties defined in section 250.105. *See* 30 C.F.R. § 250.113, *supra* n.5.

The government's reliance on § 250.146(c) circumvents the plain language of this definition of "You." Further, taken in context, § 250.146(c) is directed to the same parties encompassed by the definition of "You." Section 250.146 begins with the question, "Who is responsible for fulfilling *leasehold obligations*?" and is followed by the statement that the government relies upon: "the lessee, operator (if one has been designated), and the person actually performing the activity. . . are jointly and severally responsible for complying with the regulation." 30 C.F.R. § 250.146(c) (emphasis added). This provision dictates the obligations of leaseholders and designated operators rather than the criminal liability of contractors. Its text refers to those parties who are "jointly and severally responsible," a term of art reserved for civil rather than criminal liability. *See Joint and Several Liability*, Bryan A. Garner, *Garner's Dictionary of Legal Usage* 493 (3d ed. 2011) (referring to joint and several liability exclusively in terms of civil law); *Honeycutt v. United States*, 137 S. Ct. 1626, 1631 (2017) (describing joint and several liability as a

"creature of tort law"). The government cites no cases demonstrating support for joint and several *criminal* liability.[9]

Section 250.146(c) therefore provides that even when someone besides the lessee or operator is "the person actually performing the activity," the lessee and designated operator remain "jointly and severally responsible for complying with the regulation." *Id.* Indeed, when the regulation that became § 250.146(c) was first proposed, the agency explained it did not intend to expand regulatory liability to contractors, but to hold operators responsible for their contractors' actions:

> We would emphasize in Sec. 250.15(d) [now Sec. 250.146(c)] that, in addition to the lessee and the operator, all persons who conduct lease activities on behalf of the lessee or operator must also comply with our regulations. *The operator is responsible for the*

---

[9] After oral argument in this court, the government cited several cases purporting to evidence the possibility of joint and several criminal liability, but all of them relate to criminal conspiracy, RICO, forfeiture, or restitution. Not one of those cases implies, as the government does here, that criminal liability may be imposed jointly and severally. *See, e.g.*, *United States v. Edwards*, 303 F.3d 606, 643 (5th Cir. 2002) (those in a RICO enterprise are jointly and several liable for the proceeds of the enterprise); *United States v. Quiroz-Hernandez*, 48 F.3d 858, 868 (5th Cir. 1995) (Co-conspirators may "be liable for the substantive offenses committed by other members of the conspiracy in furtherance of the common plan."); *United States v. Lindell*, 881 F.2d 1313, 1322 (5th Cir. 1989) (holding that marijuana possession "may be joint among several defendants."). Even more significant, the instant case concerns criminal negligence, not conspiracy or RICO charges. A conspiracy by nature is an agreement to violate the law, or "an agreement between two or more people to behave in a matter that will automatically constitute an offense by at least one of them," *Garner's Dictionary of Legal Usage* 175. Joint and several liability means that "the liability of two or more obligors may be enforced against them all by a joint action or against any of them by an individual action." *Id.* at 493. Joint and several liability may be imposed without culpability of some of the liable parties, whereas criminal liability requires individual culpability on the part of each person charged. Forfeiture and restitution concepts are relevant only as adjuncts to the individual criminal liability of defendants.

*performance of its contractors. [BSEE] will hold the operator accountable for the contractors' performance.*

63 Fed. Reg. 7335 (Feb.13, 1998) (emphasis added).

The government disputes the district court's reasoning that this agency explanation can be read to exclude contractor liability through the interpretive canon *expressio unius est exclusio alterius,* because a preamble cannot effect "a partial repeal . . . by implication" of a "formally enacted" rule. *United States v. Vonn*, 535 U.S. 55, 65, 122 S. Ct. 1043, 1050 (2002). We do not misapply the preamble, but we take it as a formal agency recognition of its authority that is fully consistent with both the limited definition of "You" in § 250.105 and the description of "leasehold obligations" in § 250.146(c): lessees cannot escape responsibility for regulatory compliance by hiring out work to contractors.

Moreover, the drafting history of the definition of "You" undermines the government's recently coined interpretation. In 1998, BSEE proposed to rephrase Part 250 in plain English, replacing the term "lessee" with "You." A comment submitted during rulemaking sought to define "You" to include "any person an MMS order or decision may adversely impact." Postlease Operations Safety, 64 Fed. Reg. 72756, 72758 (Dec. 28, 1999). As the appellees note, this proposed language would have extended the definition of "You" to contractors. Because complex, overlapping cross-indemnity provisions are an inherent feature throughout the oil and gas industry, actions taken against lessees could adversely impact multiple layers of contractors and subcontractors that might have been swept into this broader proposed definition of "You." But BSEE rejected this comment and its proposed language in favor of a definition limited to lessee/permittee/designated operator responsibility. *Id.*

Until very recently, public statements by the regulating agencies confirmed that the regulations do not apply to contractors. In March 2011, BSEE promulgated a new "Safety and Environmental Management Systems"

rule designed to respond to the Deepwater Horizon incident and spill. The agency conducted a public workshop for oil and gas companies and advertised in bold, fully capitalized, underlined text that "30 CFR 250.105 defines '**YOU**' . . . This definition **DOES NOT** include a **CONTRACTOR**." Further, when publishing the final rule, BSEE stated that it "does not regulate contractors; we regulate operators." 75 Fed. Reg. 63610, 63616 (Oct. 15, 2010). The government asserts that these statements were issued in connection with different rules applicable only to leaseholders and operators, but we are unpersuaded. The new rule pertains as much to safety and the environment as the regulations these appellees are charged with violating.

The consistency of over sixty years' prior administrative practice in eschewing direct regulatory control over contractors, subcontractors and individual employees supports the district court's conclusion that these regulations do not apply to nor do they potentially criminalize the appellees' conduct.

**III.**

In further defense of its expansive reading of § 250.146(c), the government argues that this court has upheld criminal and civil penalties before where regulations created duties and "violators" of the regulations were sanctioned. The government cites two cases for this proposition. *See United States v. Ho*, 311 F.3d 589 (5th Cir. 2002) (upholding criminal liability under Clean Air Act regulations); *Floyd S. Pike Elec. Contractor, Inc. v. Occupational Safety & Health Review Comm'n (Pike)*, 576 F.2d 72 (5th Cir. 1978) (upholding civil liability and $800 fine for violating OSHA regulations).

No one disputes that many statutes authorize implementing regulations and then impose criminal liability on entities or individuals for violating the regulations. It is not the principle, but its specific application that is at issue here. The general principle does not answer the question of whether under

these OCSLA regulations criminal liability extends to these appellees. The question before us is whether the regulations that are specifically directed at lessees and permittees also extend penalties to contractors and individuals.

The virtually non-existent past enforcement of OCSLA regulations against contractors confirms that the regulations were never intended to apply to the appellees. The government marshals only two pieces of evidence that OCSLA's regulations might have been enforced against contractors: a 1988 guilty plea by a contractor reported in the New York Times, and a 1981 memorandum from the Department of the Interior that hypothetically mentions assessing civil penalties against "diving contractors." *See* Dep't of the Interior, No. M-36942, 1981 WL 29228, Opinion Letter on Refunds and Credits Under the Outer Continental Shelf Lands Act (Dec. 15, 1981). The Solicitor's Office memorandum concerned royalty payments to lessees, not criminal liability for contractors.

As the BSEE itself acknowledged, it had not issued civil incidents of non-compliance against contractors before 2011. *See supra* n.2. On the contrary, past civil enforcement actions squarely placed on lessees and operators the duty to ensure contractors' compliance with leasehold obligations. *See ATP Oil and Gas Corp.*, 178 IBLA 88, 97 (Aug. 5, 2009) ("[OCS] lessees and operators are responsible for ensuring safe and workmanlike operations and conditions . . . and that includes contractors working on their behalf . . . ."); *Seneca Resources Corp.*, 167 IBLA 1 (Sept. 15, 2005) (Seneca, as leaseholder, liable for contractor's safety violations); *Petro Ventures, Inc.*, 167 IBLA 315 (Dec. 30, 2005) (same).

The government also cites *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558 (5th Cir. 2003) to suggest that § 250.146(c) can impose liability on contractors, but it has misread that case. In *Fruge*, a worker filed a personal injury lawsuit against an offshore platform owner and contractors hired by the

owner and contended that §§ 250.146(a) and (c) imposed strict civil liability upon the defendants. *Fruge* rejected the plaintiff's arguments and ruled that there was no implied private cause of action for the plaintiff.

The plaintiff did argue that section 250.146(c) "charges that the lessee, the operator, and the person actually performing the activity 'are jointly and severally responsible' for complying with the offshore [Interior] regulations."). *Fruge,* 337 F.3d at 561. But the court did not incorporate that logic into its holding. Instead, in characterizing § 250.146(c), this court noted MMS's then-official position that "both lessee and the designated operator are required to bear the non-monetary obligations under the lease as well as any obligations under the regulations." *Id.* at 565 n.4. This characterization is consistent with the regulation's definition of "You," which imposes obligations on lessees and designated operators but not contractors. The *Fruge* opinion did not find civil contractor liability.

Finally, "[t]he government has pointed to no precedent for criminal liability . . . in circumstances like those presented here." *United States v. Brennan,* 183 F.3d 139, 150 (2d Cir. 1999).

## IV.

The government argues that the regulations, reviewed in a broader context, may result in criminal liability for anyone who fails to comply with them. The regulations define a "person" as "a natural person, an association . . . a State, a political subdivision of a State, or a private, public, or municipal corporation." 30 C.F.R. § 250.105. They define a "violator" as "a person responsible for a violation," and a violation includes "failure to comply with . . . any regulations issued under the OCSLA." 30 C.F.R. § 250.1402. That subpart "explains [the agency's] civil penalty procedures whenever a lessee, operator or other person engaged in oil, gas, sulphur or other minerals operations in the [outer continental shelf] has a violation." 30 C.F.R.

No. 16-30561

§ 250.1400.  Thus, the government contends that penalties cannot be limited to lessees and designated operators or even the definition of "You," but extend to any person responsible for a violation.  Contractors are persons; contractors can therefore be violators, the government argues, consequently, contractors can be criminally liable.[10]

This argument ignores the rule that a general provision in a comprehensive regulatory scheme must yield to more specific, conflicting provisions.  *RadLAX,* 132 S. Ct. at 2070-71 ("[I]t is a commonplace of statutory construction that the specific governs the general.") (internal quotation omitted).  *See also* Antonin Scalia & Bryan A. Garner, *Reading Law: Interpretation of Legal Texts* 183 (2012).  The appellees were indicted under three provisions of 30 C.F.R. § 250.113, all of which are directed at "You," not at just any person, and § 250.146(c), which as previously addressed, does not impose criminal liability beyond the definition of "You."  Because the applicable regulatory definitions unambiguously exclude contractors, more general liability provisions do not control. [11]

V.

Without actually conceding that its asserted OCSLA enforcement powers have never before been exercised against contractors and subcontractors, the government takes the position that the statute and regulations have *always* been broad enough to embrace such powers, and the lack of prior use demonstrates, at most, the exercise of prosecutorial discretion.  Consequently,

---

[10] *But see* 30 C.F.R. § 550.105, BOEM regulations, which defines "You" exactly as in § 250.105—excluding contractors and subcontractors

[11] If the arguments on the application of the regulations to contractors were equally persuasive, the appellees argue the rule of lenity should break the tie.  *See United States v. Santos*, 553 U.S. 507, 514, 128 S. Ct. 2020, 2025 (2008).  But that "venerable rule," *id.*, is unnecessary to the resolution of this case.  Properly read, the regulations are not ambiguous; they plainly do not subject contractors to criminal liability.

contractors and subcontractors *always* had fair notice of their potential exposure to civil penalties up to \$42,704/day[12] and criminal liability. But "where, as here, an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute." *Christopher v. SmithKline Beecham Corp.,* 567 U.S. 142, 158, 132 S. Ct. 2156, 2168 (2012).

In fact, the government points only to events that preceded this incident by a few months as giving notice to the appellees and the industry. These include BSEE's announcement of its citations in connection with the Deepwater Horizon blowout; indirect references to section 250.146(c) when announcing other new regulations, *see* 77 Fed. Reg. 50,856, 50,879 (Aug. 22, 2012); and its publication in August 2012 of Interim Policy Document No. 12-07 (Aug. 15, 2012), which purports to elucidate principles for enforcing civil penalties only—not criminal enforcement—against contractors and subcontractors. The government, however, undercuts reliance on the Interim Policy Document as it disclaims that the policy statement, which was issued without notice and comment rulemaking, has any binding force so as to induce reliance by the regulated entities.

More revealing, in our view, is that when BSEE has promulgated recent regulations, it has gone out of its way to specifically include contractors and subcontractors within the regulatory purview. *See, e.g.,* BOEM's OCS alternative energy regulation, which expressly includes contractors. 30 C.F.R. § 585.112; 79 Fed. Reg. 21,617, 21,621 (Apr. 17, 2014).

If this case involved only civil sanctions against the appellees, the government would perhaps ask this court to apply *Auer* deference to its

---

[12] This is the current maximum civil penalty for violating OCSLA per day per violation. 30 C.F.R. § 250.1403.

interpretation of the regulations. *Auer v. Robbins*, 519 U.S. 452, 117 S. Ct. 905 (1997). The government would then have to defend its novel approach against a series of Supreme Court decisions that have afforded "considerably less deference" when an agency interpretation conflicts with an earlier, consistently held view. *I.N.S. v. Cardoza-Fonseca,* 480 U.S. 421, 446 n.30, 107 S. Ct. 1207, 1221 n.30 (1987). The Court recently reiterated that deference may be "unwarranted" "when the agency's interpretation conflicts with a prior interpretation . . . ." *Christopher*, 567 U.S. at 155, 132 S. Ct. at 2166 (citation omitted). "[P]ersuasive weight" is due to an agency's contemporaneous construction of applicable law and subsequent consistent interpretation, *Watt v. Alaska,* 451 U.S. 259, 272-73, 101 S. Ct. 1673, 1681 (1981), whereas a "current interpretation, being in conflict with its initial position, is entitled to considerably less deference." *Id.* (citation omitted).

The Court summarized the relevant approach in an oft-cited decision where it concluded that "[w]e have declined to follow administrative guidelines in the past where they conflicted with earlier pronouncements of the agency." *General Elec. Co. v. Gilbert,* 429 U.S. 125, 143, 97 S. Ct. 401, 411 (1976) (citations omitted). The Court overturned an EEOC guideline that, having been promulgated eight years after the law passed, was "not a contemporaneous interpretation of Title VII," and "more importantly, the 1972 guideline flatly contradicts the position which the agency had enunciated at an earlier date, closer to the enactment of the governing statute." *Id.*

The analogy to the present case cannot be missed. BSEE and its predecessors enforced the regulations here at issue for over sixty years only against lessees, permittees and designated operators of offshore production rights. The agency placed responsibility, both civil and potentially criminal, on the named parties for ensuring compliance with the regulations by all of the many contractors, subcontractors and individual employees whose efforts are

necessary to develop the Outer Continental Shelf. The agency explicitly disclaimed imposing direct regulatory control on the subordinate parties. The agency's 2011 about-face "flatly contradicts" the agency's earlier, contemporaneous interpretation of the regulations. Its new position is hardly entitled to deference in the civil context. *See Island Operating Co., supra* n.8.[13]

Worse, this is no civil enforcement proceeding where "only" money is at stake. "[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope . . . ." *United States v. Lanier,* 520 U.S. 259, 266, 117 S. Ct. 1219, 1225 (1997). It was novel for the government to indict these appellees for violating the welding regulations, the regulatory duty for which rested on "You," the lessees, permittees and designated operators of the West Delta Lease Block 32 facilities. No prior judicial decision countenanced this action, which is at odds with a half century of agency policy, and we will not do so now.

## CONCLUSION

For the foregoing reasons, the judgment of the district court dismissing the OCSLA counts of indictment against these appellees is **AFFIRMED**.

---

[13] In the civil context, there are grave implications of the new policy for contractors, who heretofore have had no need to price their services according to the regulatory risk; no ability to engage insurance protection for regulatory violations; no need to personally review and apply the exact regulations (because they followed the directives of the designated operator or lessee); and no incentive to impose themselves in the offshore workplace as self-protection against others' potential regulatory violations. *See generally,* John Cossa, *Liability of Owners, Contractors, and Non-operators*, 2016 No. 1 Rocky Mt. Min. L. Inst. Paper No. 6, 6-11 to -13.